**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0234n.06

No. 07-2089

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**

**Feb 29, 2012**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| EUGENE BROWN, | ) | |
| | ) | |
| **Petitioner-Appellant,** | ) | **ON APPEAL** FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| KENNETH T. MCKEE, Warden, | ) | |
| | ) | |
| **Respondent-Appellee.** | ) | **O P I N I O N** |
| _____ | ) | |

**Before: COLE and MERRITT, Circuit Judges, and VARLAN, District Judge.**[*]

**THOMAS A. VARLAN, District Judge.** Petitioner Eugene Brown ("Petitioner") was convicted of first-degree felony murder and felony firearm. He was sentenced to life imprisonment without parole for the first-degree felony murder conviction plus two years for the felony firearm conviction. Petitioner appealed his convictions to the Michigan Court of Appeals, raising ineffective assistance of counsel. He also filed a motion requesting that the Michigan Court of Appeals remand his case to the trial court for development of a factual record and initial determination on his ineffective-assistance-of-counsel claim. After the Michigan Court of Appeals denied both requests, Petitioner then unsuccessfully sought leave from the Michigan Supreme Court to appeal the decisions of the Michigan Court of Appeals.

_____

[*]The Honorable Thomas A. Varlan, United States District Judge for the Eastern District of Tennessee, sitting by designation.

Petitioner subsequently filed a writ of habeas corpus in the district court pursuant to 28 U.S.C. § 2254, arguing that he was denied the constitutional rights to effective assistance of counsel and due process. The district court denied relief on both grounds, but granted a certificate of appealability with respect to the following: "Whether Petitioner's Sixth Amendment right to effective assistance of trial counsel was violated when his trial counsel failed to investigate and raise the issue of competency to stand trial and the defense of insanity." Petitioner then filed an appeal. For the reasons explained herein, we affirm the judgment of the district court.

## I. BACKGROUND

Petitioner's conviction arises from the robbery and fatal shooting of Jeffrey Burda ("Burda"), an ice cream delivery person, in Detroit, Michigan, on December 23, 1999. James Jett ("Jett"), Lacoy Adrow ("Adrow"), and Petitioner were accused of having been involved in the crime.

Petitioner was arrested on January 1, 2000, and charged with homicide felony murder and felony firearm. Following his arrest, the 36th District Court referred him to the Third Circuit Court-Criminal Division Psychiatric Clinic for a competency evaluation. On March 2, 2000, Dr. Ronald E. Kolito found Petitioner competent to stand trial, and at a hearing on May 3, 2000, according to the 36th District Court docket sheet, Petitioner was found competent. A preliminary examination was held in June 2000, and for purposes of the preliminary examination, Petitioner's counsel stipulated that Petitioner was competent to stand trial.

On March 15, 2000, the 36th District Court issued an order for an expedited examination to determine whether Petitioner was competent to waive his *Miranda* rights. On August 10, 2000, the

Wayne County Circuit Court signed an order for appointment of an independent psychologist to determine whether Petitioner was competent to waive his *Miranda* rights, but a review of the record indicates that an independent examination was never obtained.

Petitioner's first court-appointed attorney, Richard Glanda ("Glanda"), was permitted to withdraw as counsel on January 30, 2001. The same day, Lawrence Williams ("Williams") was appointed to represent Petitioner, and continued representing Petitioner through his trial.

Prior to trial, Williams moved to suppress Petitioner's confession on the grounds that Petitioner had invoked his right to remain silent by requesting an attorney after being arrested and that Petitioner was too intoxicated to knowingly and intelligently waive his Fifth Amendment rights, as he was arrested on New Year's Day and had ingested large quantities of alcohol and marijuana. Accordingly, a hearing known as a *Walker* hearing[1] was conducted.

The Michigan Court of Appeals, the last state court to rule on Petitioner's claims, summarized the facts adduced at the *Walker* hearing as follows:

> A *Walker* hearing was also held to determine whether [Petitioner's] confession should be suppressed. From the context of the testimony, it is apparent that the hearing did not raise the issue of competency, but rather examined whether [Petitioner's] waiver was knowingly and intelligently given.
>
> Shandalyn Wilson was called as a witness at the *Walker* hearing. Wilson indicated that [Petitioner] was the father of her child. On New Year's Eve, 1999, she was with [Petitioner] from approximately 8:00 p.m. until approximately 2:00 a.m. on New Year's Day, 2000. Wilson testified that during that time [Petitioner] was "high"; Wilson observed [Petitioner] smoke two blunts, as well as drink half of a bottle of

---

[1]A *Walker* hearing is a hearing held in Michigan state courts, outside the presence of the jury, to determine whether a confession was voluntarily made. *People v. Walker*, 132 N.W.2d 87 (1965).

tequila. The following afternoon Wilson went to [Petitioner's] house, where she saw him smoking more marijuana and drinking brandy.

Barbara Simon, an investigator with the Detroit police department, testified that she interviewed [Petitioner] on January 1, 2000. Simon observed [Petitioner's] physical condition and stated that he appeared "fine, normal." Simon saw nothing to make her think [Petitioner] was under the influence of any sort of drug or alcohol. [Petitioner's] eyes were neither bloodshot nor glassy, and his speech was not slurred. Simon added there was nothing to suggest any sort of physical injury.

In talking with [Petitioner], Simon learned he was nineteen years of age, and that he was enrolled in the twelfth grade at Osborn High School. Simon had [Petitioner] read his constitutional rights aloud to ensure he could read and write. [Petitioner] indicated that he understood, initialed each right, and signed the form. [Petitioner] did not indicate that he had any questions, and he did not ask for an attorney. Simon took a statement from [Petitioner], which he read to ensure accuracy, and then he signed the statement.

[Petitioner] testified that he was arrested on January 1, 2000. On New Year's Eve, [Petitioner] was at his mother's house drinking tequila and brandy. [Petitioner] estimated that he consumed a fifth of tequila, and a portion of a pint of brandy. In addition, [Petitioner] had approximately five "blunts" or marijuana cigars. That evening he drove to his house to sleep; when he woke up the following morning, he resumed drinking the remainder of the brandy, as well as smoking "blunts." A "short time" later, [Petitioner] was arrested and taken to police headquarters. [Petitioner] testified that he asked for an attorney when he was arrested, as well as when he arrived at police headquarters. On cross-examination, [Petitioner] acknowledged a constitutional rights form bearing his initials. Moreover, [Petitioner] noted that he had been arrested a year prior for carrying a concealed weapon. When [Petitioner] was arrested for that offense, he was advised of his rights, and he waived his right to counsel.

James Fisher, an investigator with the Detroit police department testified that he did not smell alcohol on [Petitioner's] breath. Clifford Jordan, also of the Detroit police department, testified that he assisted in arresting [Petitioner] and that [Petitioner] never requested an attorney. Terrell Shaw, of the Detroit police department, corroborated that [Petitioner] never asked for an attorney. Moreover, Shaw did not smell marijuana or alcohol when he arrested [Petitioner].

> After hearing the arguments of the parties, the trial court ruled that [Petitioner's] statements to the police were admissible. The trial court found that [Petitioner] did not ask for an attorney, and that he was not intoxicated. The trial court believed that [Petitioner] would not have been able to function had he consumed as much as he indicated. Accordingly, the trial court determined that [Petitioner's] confession was "knowingly, freely and voluntarily given."

*People v. Brown*, No. 239466, 2003 WL 22681550, at *4–5 (Mich. Ct. App. Nov. 13, 2003) (unpublished).

Petitioner was tried with Jett, and the trial spanned nine days. Adrow, on the other hand, pled guilty to a reduced charge of second-degree murder.

During the trial, Petitioner's statement was read into the record by Officer Barbara Simon ("Officer Simon"). In his statement, Petitioner told Officer Simon that he, Jett, and Adrow got together early December 23, 1999, that he was driving the van, which was stolen, and that they spotted the ice cream truck. He also stated that Jett and Adrow got out of the van and went over to the victim. Adrow hit the victim, who started to run, and then Jett shot the victim. Jett and Adrow then returned to the van, and Petitioner drove off, but Petitioner later jumped out of the van. Petitioner further told Officer Simon that the robbery was Jett's idea and that the murder weapon was a .38 caliber handgun, which belonged to Petitioner. Upon inquiry of Officer Simon about the gun, Petitioner said he "left [the gun] at the house, the weed house," which was on Wilfred, "because the gun was hot" and Jett had just shot someone with it. (R. 26-4 at 25). He denied being threatened or promised anything to make a statement or answer any question, and when asked whether the statement he had given was true, he replied, "Yes, I'm sorry that the man got shot. Things just got

5

out of hand. [Jett] should not have shot the man." (*Id*. at 26). Petitioner had an opportunity to review the statement, and signed his name throughout the statement.

Adrow also testified at trial. He testified that he had a conversation with Petitioner and Jett about committing a robbery. He further testified that Petitioner provided the weapon, a .38 caliber handgun, which was black and short, and that a stolen van was driven by Petitioner to a Detroit gas station where Burda was spotted. Adrow testified that Jett got out of the van first and began robbing Burda. Adrow then got out of the van and struck Burda. As Burda attempted to escape, Jett shot and killed him. Adrow also testified that Jett shot at several other individuals in the area, hitting and injuring one of them. Jett and Adrow then returned to the van, which Petitioner drove away. Adrow further testified that Jett gave the gun back to Petitioner, and the three went to "[t]he weed spot," which was "[t]he house on Wilfred." (R. 27-3 at 15).

Several other individuals testified as well. Aaron Gilmore testified that he heard shots, ran, and then was shot in the back of his shoulder. He further testified that he later saw the victim lying on the ground and that the man who pointed a gun at him had on a ski mask. Rayvnne Gilmore then testified to witnessing the shooting and hearing the van or a vehicle speed off, but he could not identify the driver of the van. Anthony Billings testified that he saw two men in ski masks, appearing to rob the victim. After the victim collapsed, he stated that the two men headed toward the van parked nearby. He also saw a man sitting behind the driver's seat of the van, but he could not see anything about his appearance. After the two men entered the van, it quickly sped off. He further testified that the gun used was a revolver, which was black and big. Edward Thomas, who

was with Anthony Billings on the day in question, testified that he heard someone say "give me the m-f-ing money" in a demanding way and a person reply that he did not have any money, that he heard shots, and that he saw a man with a mask shooting at him and Anthony Billings, who was shot. (R. 25-2 at 11). Edward Thomas testified as well, and stated that he saw another man with a mask on. Darlene Dorsette testified, and she described how her van had been stolen just prior to the incident. In addition, various officers and investigators, as well as the doctor who performed the autopsy on Burda, testified. One such officer was Officer Craig Stewart, who testified that he went to the hospital and was given a nine millimeter slug from the complainant.

Petitioner's defense was that there was no credible evidence to establish Petitioner knowingly took part in the robbery and murder. Counsel attacked Adrow's testimony in his opening and closing arguments as well as through cross-examination by arguing that Adrow was testifying against Petitioner solely because he had been offered to plead guilty to a reduced charge of second-degree murder. He exposed that Adrow had made two contradictory statements to the police, that neither statement mentioned Petitioner being involved in the shooting, and that even if Adrow was to be believed, there was no evidence that Petitioner knew Jett was going to shoot and kill the victim. Counsel also elicited testimony from the various eyewitnesses that they could not identify Petitioner.

In addition, Petitioner's counsel elicited testimony from Officer Simon that Petitioner did not initial the part of the constitutional rights form that stated he had not been threatened by the police. Counsel also challenged Officer Simon's testimony by obtaining admissions from Officer Simon that Petitioner's statement had not been videotaped or audiotaped or written by Petitioner in his own

7

handwriting. Officer Simon acknowledged that there were no witnesses to corroborate Petitioner's confession and that, although Petitioner admitted to driving the van, she did not ask Petitioner if he was the getaway driver or a lookout. Officer Simon also conceded that she never asked Petitioner whether the robbery was pre-planned. Petitioner's counsel moved for a directed verdict on the count of felony murder, which was denied.

The jury returned a verdict of guilty as to both charges against Petitioner. He was sentenced to life in prison without parole for the first-degree-murder charge and a consecutive two years' imprisonment for the felony-firearm charge.

Petitioner thereafter filed a direct appeal with the Michigan Court of Appeals, raising the following issue:

> Was Defendant denied his state and federal constitutional rights to the effective assistance of trial counsel where counsel failed to investigate and raise the issue of competency to stand trial and to waive his *Miranda* rights and the defense of insanity, both at the *Walker* hearing and at trial, and presented no defense at trial, no witnesses, no evidence of any kind, including no evidence of defendant's psychiatric hospitalizations and treatment, mental illness and significant mental retardation, which would not only support a defense of insanity or lack of competency, but would also cast grave doubt upon the statement he allegedly made to the police, and even told the defendant not to testify?

(R. 33, Pet'r's App. Br. at 3). Petitioner's conviction, however, was affirmed. *Brown*, 2003 WL 22681550.

Petitioner also filed a motion to remand pursuant to Mich. Ct. R. 7.211, commonly known as a *Ginther* motion,[2] with the Michigan Court of Appeals. Petitioner sought an order remanding

---

[2]*See People v. Ginther*, 212 N.W.2d 922 (Mich. 1973).

his case to the trial court for hearing, development of a factual record, and initial decision on his claim for ineffective assistance of counsel. The Michigan Court of Appeals denied the motion to remand "for failure to persuade the Court of the need to remand at this time." (R. 2-2 Ex. 2).

Petitioner then sought leave from the Michigan Supreme Court to appeal the decisions of the Michigan Court of Appeals affirming his conviction and denying his motion to remand. *People v. Brown*, 470 Mich. 873 (2004). The request was denied, although two justices indicated they would have remanded the case for an evidentiary hearing on Petitioner's claim of ineffective assistance of trial counsel. *Id.*

Pursuant to 28 U.S.C. § 2254, Petitioner subsequently filed a petition for writ of habeas corpus, raising two claims: denial of the constitutional right to effective assistance of counsel and the constitutional right to due process of law. The district court denied habeas relief on both grounds.

Petitioner then filed notice of appeal and a motion for certificate of appealability. Petitioner sought a certificate of appealability with respect to his ineffective-assistance-of-counsel claim and his due-process claim, but the district court granted a certificate of appealability only with respect to the following: "Whether Petitioner's Sixth Amendment right to effective assistance of trial counsel was violated when his trial counsel failed to investigate and raise the issue of competency to stand trial and the defense of insanity." (R. 45).

Upon request by Petitioner, this Court denied Petitioner a certificate of appealability on the due process issue, finding the district court correctly held that there is no federal constitutional right

9

to appeal a state-court conviction. (Order Den. Appl. for Partial Certificate of Appealability, Mar. 18, 2008). Further, this Court noted violations of state law and procedure that do not infringe upon specific constitutional protections are not cognizable in a federal habeas corpus action. (*Id*.). This Court also denied Petitioner's motion to reconsider the Court's order denying Petitioner a certificate of appealability. (Order Den. Mot. To Recons., June 23, 2008).

## II. STANDARD OF REVIEW

This Court reviews *de novo* the legal conclusions for a district court's dismissal of a habeas petition. *Davis v. Coyle*, 475 F.3d 761, 766 (6th Cir. 2007). The factual findings underlying the district court's analysis, on the other hand, will not be set aside unless those findings are clearly erroneous. *Id*.

Because Petitioner filed his petition for a writ of habeas corpus after the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), that statute governs this Court's review of the case. A writ of habeas corpus may not be granted under AEDPA for any claim that was adjudicated on the merits in state court unless the adjudication of that claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2). For the purposes of AEDPA, this Court reviews the last state-court decision on the merits, which in this case is the decision of the Michigan Court of Appeals. *Dyer v. Bowlen*, 465 F.3d 280, 284 (6th Cir. 2006) (citation omitted). The Supreme Court has recognized

that "AEDPA imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, — U.S. —, 130 S. Ct. 1855, 1862 (2010) (footnote and citations omitted).

Under the "contrary to" clause of § 2254(d)(1), a federal court may grant the writ only if the state court arrived at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decided a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). "If the state-court decision identifies the correct governing legal principle in existence at the time, [however,] a federal court must assess whether the decision unreasonably applies that principle" under the "unreasonable application" clause of § 2254(d)(1). *Cullen v. Pinholster*, — U.S. —, 131 S. Ct. 1388, 1399 (2011) (citation and internal quotation marks omitted).

Under the "unreasonable application" clause, a federal court may grant the writ only if the state court identified the correct governing legal principle from the Supreme Court's decisions but unreasonably applied that principle to the facts of the petitioner's case. *Williams*, 529 U.S. at 413. When assessing unreasonableness, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable." *Id.* at 409.

In determining whether a state-court decision is contrary to or an unreasonable application of clearly established Supreme Court precedent, a federal court may look only to the holdings of the

Supreme Court's decisions "as of the time of the relevant state-court decision." *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (citation and internal quotation mark omitted); *see also Greene v. Fisher*, — U.S. —, 132 S. Ct. 38, 44–45 (2011) (holding that clearly established federal law as determined by the Supreme Court under AEDPA is the law at the time of the state-court adjudication on the merits, not at the time the conviction becomes final). The reviewing court, however, may look to decisions of lower courts of appeals "to the extent [they] have already reviewed and interpreted the relevant Supreme Court case law to determine whether a legal principle or right had been clearly established by the Supreme Court." *Landrum v. Mitchell*, 625 F.3d 905, 914 (6th Cir. 2010) (alteration in original and citation and internal quotation mark omitted).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, — U.S. —, 131 S. Ct. 770, 786 (2011) (citation omitted). Further, "[e]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.* (citation omitted).

In addition, factual findings of the state court are presumed correct unless the petitioner presents clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1). "[A] decision adjudicated on the merits in a state court and based upon a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in

the state-court proceeding." *Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010) (brackets omitted) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).

Finally, the Supreme Court has recently clarified "that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, — U.S. at —, 131 S. Ct. at 1398.

## III.  DISCUSSION

### A.      Proper Scope of the Issues

Petitioner sought a certificate of appealability with respect to the two claims raised in his habeas petition: denial of the constitutional right to effective assistance of counsel and denial of the constitutional right to due process of law.  The district court granted a certificate of appealability with respect to the following issue only: "Whether Petitioner's Sixth Amendment right to effective assistance of trial counsel was violated when his trial counsel failed to investigate and raise the issue of competency to stand trial and the defense of insanity."  (R. 45).

Petitioner argues that, although the district court granted a certificate of appealability with respect to Petitioner's first claim and "reformulated" it, encompassed within that reformulation is Petitioner's argument that "trial counsel was ineffective because he presented no defense at trial, no witnesses, no evidence of any kind, and, further, even told the defendant not to testify."  (Appellant Br. 2 n.2, 7).  Petitioner also argues he should be permitted to raise his constitutional due process issue.

13

The Sixth Circuit has "repeatedly recognized" that "when AEDPA applies, 'a court of appeals will address only the issues which are specified in the certificate of appealability.'" *Searcy v. Carter*, 246 F.3d 515, 518 (6th Cir. 2001) (quoting *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1074 (6th Cir. 1997), *overruled in part by Lindh v. Murphy*, 521 U.S. 320 (1997)); *see also* 28 U.S.C. § 2253(c); *Chavis-Tucker v. Hudson*, 348 F. App'x 125, 132 n.6 (6th Cir. 2009) ("A certificate of appealability only vests jurisdiction in the appellate court to consider issues specified in the certificate." (citations omitted)); *Valentine v. Francis*, 270 F.3d 1032, 1035 (6th Cir. 2001) (limiting review of the dismissal of a habeas petition as time-barred to the particular claim certified for appealability). Despite the district court's recognition that Petitioner's first claim included several points, including, for example, that trial counsel was ineffective for failing to present any defense whatsoever, the district court's order expressly limits the issue subject to appeal to "ineffective assistance of trial counsel for failure to investigate and raise the issue of competency to stand trial and the defense of insanity." (R. 45). The district court's order further provides that it "does not find the remaining issues raised in the petition debatable among jurists of reason." (*Id.*). Also, this Court previously denied Petitioner's request for a certificate of appealability with respect to the due-process claim and subsequently denied Petitioner's motion for reconsideration of that decision. Accordingly, with respect to Petitioner's ineffective of assistance claim, the Court considers only those issues set forth in the certificate of appealability; that is, whether Petitioner's Sixth Amendment right to effective assistance of counsel was violated when his trial counsel failed to investigate and raise the issue of competency to stand trial and the defense of insanity. Likewise,

the Court finds that Petitioner's due-process claim is not properly before it as the claim is not specified in the certificate of appealability, and this Court declined to issue a certificate of appealability for this claim.[3]

### B.        Ineffective Assistance of Counsel

The Sixth Amendment to the United States Constitution, which is applicable to the States through the Fourteenth Amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. Amend. VI; *Gideon v. Wainwright*, 372 U.S. 335, 342–43 (1963). "A right to the assistance of someone with a law degree does not by itself suffice." *Couch v. Booker*, 632 F.3d 241, 245 (6th Cir. 2011). Rather, "[o]nly a right to 'effective assistance of counsel' serves the guarantee." *Id.* (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)). To establish a claim for ineffective assistance of counsel, a defendant must demonstrate that "counsel's representation fell below an objective standard of reasonableness," *Strickland v. Washington*, 466 U.S. 668, 688 (1984), and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* It requires a "substantial, not just conceivable," likelihood of a different outcome. *Richter*, — U.S. at —, 131 S. Ct. at 792 (citation omitted).

---

[3]Petitioner argues he is entitled to a hearing on his ineffective assistance claim because he has exercised due diligence. The evidentiary hearing issue, however, is merely a reiteration of the due-process claim.

With respect to determining whether counsel's representation fell below an objective standard of reasonableness, counsel's performance is viewed "under prevailing professional norms." *Strickland*, 466 U.S. at 688. "The reasonableness of counsel's actions must be judged on the facts of the petitioner's case, viewed as of the time of counsel's conduct, recognizing that counsel 'is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Smith v. Lafler*, 175 F. App'x 1, 4 (6th Cir. 2006) (quoting *Strickland*, 466 U.S. at 690). Moreover, in reviewing ineffective assistance of counsel claims, a court must begin with the premise that "under the circumstances, the challenged action [s] might be considered sound trial strategy." *Pinholster*, — U.S. at —, 131 S. Ct. at 1404 (alteration in original) (quoting *Strickland*, 466 U.S. at 689); *see also Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) ("[T]here is a strong presumption that [counsel took certain actions] for tactical reasons rather than through sheer neglect." (citation omitted)). Put another way, it is the challenger's burden to demonstrate "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.

"Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult," as "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential.'" *Richter*, — U.S. at —, 131 S. Ct. at 788 (citations omitted). "[W]hen the two apply in tandem, review is 'doubly'" deferential. *Id.* (citation omitted). Moreover, the *Strickland* standard is a general standard, "so the range of reasonable applications is substantial." *Id.* (citation omitted); *see also Knowles v. Mirzayance*, 556 U.S. 111, —, 129 S. Ct. 1411, 1420 (2009) ("[B]ecause the

*Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." (citation omitted)). "Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)." *Richter*, — U.S. at —, 131 S. Ct. at 788. "When § 2254(d) applies, the question is not whether counsel's actions were reasonable[, but] . . . . whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

In denying Petitioner's claim for ineffective assistance of counsel, the Michigan Court of Appeals determined trial counsel's actions were strategic. In relevant part, the court stated:

> [Petitioner] first argues that his trial counsel failed to look at the court file after being substituted as counsel. [Petitioner] contends that his counsel failed to investigate and pursue a claim not only of lack of competency to stand trial and lack of competency to waive his *Miranda* rights, but of legal insanity. We find, however, that these assertions are not supported by the record. There is nothing apparent from the trial court file to suggest that [Petitioner's] counsel failed to inspect the court file. As for [Petitioner's] contention that his trial counsel failed to assert that [Petitioner] lacked the competency to waive his *Miranda* rights, the trial court file reveals that [Petitioner's] counsel did pursue such a psychological examination. The examiner concluded that [Petitioner] was competent to waive his *Miranda* rights.
>
> Based on our review of the record, we believe [Petitioner's] argument that his counsel was ineffective for failing to raise the issue of [Petitioner's] mental state fails because we conclude that his counsel's actions were actually strategic. The decision whether to present an insanity defense can be an issue of strategy. The record reflects that after the determination that [Petitioner's] counsel argued that his client was intoxicated at the time of his confession . . . . [Petitioner] testified that he consumed a considerable amount of alcohol and several marijuana cigarettes on the day of his arrest and confession. [Petitioner's] counsel apparently concluded that intoxication was a better means to exclude the confession than [Petitioner's] state of mind, especially in light of the psychological report determining [Petitioner] was competent. Although we recognize that the legal standards for competency to stand trial are different from the standards to waive *Miranda* rights, [Petitioner's] trial counsel apparently determined that if he could not show that [Petitioner] lacked the

17

state of mind to waive his *Miranda* rights, he may not be able to have [Petitioner] deemed incompetent to stand trial, and that an insanity defense was likely unprovable.

*Brown*, 2003 WL 22681550, at \*7.  Petitioner now argues that the Michigan Court of Appeals erred in finding trial counsel's actions were strategic because trial counsel's strategy was predicated on inadequate preparation or failure to make a reasonable investigation.  More particularly, Petitioner argues his trial counsel's performance could not have been strategic because he failed to seek an independent psychiatric evaluation, failed to speak to Petitioner's family, failed to secure records relating to Petitioner's competency, and did not know that a competency evaluation and report was conducted and issued.

> **1.** **The State Court's Determination that Trial Counsel's Performance was Strategic was not an Unreasonable Application of Clearly Established Federal Law**

Petitioner argues that material contained in Dr. Kolito's report would have triggered an investigation into the defendant's mental history.  Petitioner specifically points to the following matters contained in that report:

> (a)  Defendant had a history of psychiatric hospitalizations and outpatient treatment, including Northeast Guidance Center, Eastwood Clinic, Detroit Receiving Hospital, Havenwyck Hospital, Kingswood Hospital, Children's Center, Butzel Family Center, and Special Education assessments in Detroit.
>
> (b)  He had a history of hallucinations, anxiety and depression.
>
> (c)  He was afraid to sign any more authorizations.
>
> (d)  He had attempted suicide three times.

18

(e)     The test results, which the examiner did not feel were valid, showed functioning in the mildly mentally retarded range.

(f)     Defendant claimed that he did not understand the functions of most court officials, did not know what his lawyer was supposed to do, and did not know the function of the judge, jury or what plea bargaining was.

(g)     Defendant claimed he was illiterate and could not read the questionnaires, denied knowledge of the meaning of very commonly used words, said he did not know his phone number, where he was born, his height, weight and other common facts.

(h)     Defendant stated that he did not know what the statement was he signed, that he could not read it and was tricked into signing and into initialing his rights.

(Appellant Br. 12–13). Petitioner also submits trial counsel was not even aware that a competency evaluation had been conducted, nor a report issued. Thus, without knowing about any competency exam or report, Petitioner claims trial counsel's actions in not pursuing the issue of competency to stand trial and the defense of insanity could not have been strategic. Further, Petitioner argues counsel's performance could not have been strategic because counsel failed to secure records of Petitioner's psychiatric hospitalization and treatment records, to secure school records indicating Petitioner's alleged mental retardation, to obtain an independent psychiatric evaluation, and to interview Petitioner's family members. With regard to the latter, he points to his habeas counsel's affidavit, which provides that Petitioner's aunt attempted to speak with Petitioner's trial counsel

about Petitioner's background, psychiatric problems, mental illness, and psychiatric hospitalizations, but Petitioner's trial counsel would not speak with her.[4]

In *Strickland*, the Supreme Court outlined the parameters of what it described as "counsel's duty to investigate":

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

466 U.S. at 690–91 (emphasis added). "Under this standard, counsel is required to conduct investigation at least to the extent necessary to determine that no further investigation is necessary. It does not allow counsel to fail to conduct any investigation at all." *Storey v. Vasbinder*, 657 F.3d

---

[4]The district court appropriately summarized the affidavit as follows:

> Petitioner's current habeas counsel, Samuel Posner, who also represented Petitioner on his state appeal, has provided the Court with an affidavit, in which he claims that he spoke with Petitioner's trial counsel, Mr. Williams. According to this affidavit, Mr. Williams told Mr. Posner "that he was not aware that there had been a competency hearing and competency evaluation before the preliminary examination in the 36th District Court, was unaware of any competency report and had never seen it, and that he was unaware that [Petitioner] had had any history of psychiatric problems, mental illnesses, or psychiatric hospitalizations." Mr. Posner also claims that Petitioner informed him that he wanted to testify at trial, but that Mr. "Williams told him not to testify and to say that he did not want to testify if asked by the court." Finally, Mr. Posner claims that Petitioner's family told him that they wished to speak with Mr. Williams about Petitioner's history of mental illnesses and psychiatric hospitalizations, but claimed that Mr. Williams would not speak with them.

*Brown v. McKee*, No. 05-72156, 2007 WL 2050350, at *9 (E.D. Mich. July 17, 2007).

372, 390 (6th Cir. 2011) (Clay, J., dissenting) (citing *Williams v. Taylor*, 529 U.S. 362 (2000)). This Court has recently stated this principle in the following way:

> To make a reasoned judgment about whether evidence is worth presenting, one must know what it says. While the point of the Sixth Amendment is not to allow Monday-morning quarterbacking of defense counsel's strategic decisions, a lawyer cannot make a protected strategic decision without investigating the potential bases for it.

*Couch*, 632 F.3d at 246 (citing *Strickland*, 466 U.S. at 690–91).

Petitioner submits, as he submitted to the Michigan Court of Appeals, that his second trial counsel did not know that a competency evaluation was conducted, nor a report issued. Indeed, the record reflects that it was Petitioner's original trial counsel, Glanda, who initiated the competency evaluation and who stipulated competency for purposes of the preliminary examination. Thus, it is plausible that Petitioner's second trial counsel, Williams, would not have known about the evaluation and report. Further, it seems as though, had Williams reviewed the file, including the competency report, it would have suggested to him that Petitioner may have had some history of mental illness and would have prompted an investigation to determine whether he should raise the issue of competency to stand trial or the defense of insanity. For example, the report provided that Petitioner had a history of psychiatric hospitalizations and outpatient treatment and that test results showed functioning in the mildly mentally retarded range. Even more, Petitioner submits that his aunt attempted to speak to Williams about his family and mental history, but that Williams would not speak with her. In light of all of this, it appears Williams's actions may have fallen below an objective standard of reasonableness. *Accord Couch*, 632 F.3d at 246 ("It is particularly unreasonable to fail to track down readily available and likely useful evidence that a client himself

21

asks his counsel to obtain." (citation omitted)); *Lafler*, 175 F. App'x at 4–5 (finding counsel's failure to investigate complainant's daughter's stay at a psychiatric facility was not based upon a reasonable professional judgment because he never attempted to ascertain the contents of a related report); *Profitt v. Waldron*, 831 F.2d 1245, 1248–50 (5th Cir. 1987) (finding trial counsel ineffective for, among other reasons, failing to investigate the reasons the defendant was in a mental institution).

In rejecting Petitioner's argument that his trial counsel was ineffective for failing to investigate and pursue the claims of lack of competency to stand trial and legal insanity, however, the Michigan Court of Appeals found "nothing apparent from the trial court file to suggest that [Petitioner's] counsel failed to inspect the court file." *Brown*, 2003 WL 22681550, at *7. The Michigan Court of Appeals then went on to determine that trial counsel satisfied *Strickland*'s standard because he "apparently concluded that intoxication was a better means to exclude the confession than [Petitioner's] state of mind, . . . in light of the psychological report determining [Petitioner] was competent," and that "if he could not show that [Petitioner] lacked the state of mind to waive his *Miranda* rights, he may not be able to have [Petitioner] deemed incompetent to stand trial, and that an insanity defense was likely unprovable." *Id.*

AEDPA, in conjunction with *Strickland*, requires this Court to give double deference to the findings of the Michigan Court of Appeals, and the Court must determine whether the state court's application of *Strickland* was unreasonable, not whether defense counsel's performance fell below the *Strickland* standard. *Richter*, — U.S. at —, 131 S. Ct. at 785, 788. As there is nothing in the record that suggests Williams failed to inspect the file, aside from the hearsay statements in

Petitioner's habeas counsel's affidavit, the decision of the Michigan Court of Appeals is not unreasonable.

In sum, although it appears trial counsel's performance may have been deficient for failing to conduct a reasonable investigation into Petitioner's mental state and whether to raise competency to stand trial and an insanity defense, the Michigan Court of Appeals's application of *Strickland* was not unreasonable, and at best, fairminded jurists could disagree on the correctness of the state court's decision. Thus, Petitioner is not entitled to habeas relief. *Richter*, — U.S. at —, 131 S. Ct. at 786 ("[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." (citation omitted)); *see also id.* ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." (citation omitted)).

### 2. Petitioner was Not Prejudiced

Even assuming trial counsel's performance was deficient and that the Michigan Court of Appeals's application of *Strickland* was unreasonable, Petitioner was not prejudiced. The Michigan Court of Appeals did not address this prong of the *Strickland* test, *see Brown*, 2003 WL 22681550, at *7; hence, the Court must review this prong *de novo*, *see Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (holding that the Supreme Court's review was "not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the *Strickland* analysis").

23

Under this prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* It requires a "substantial," not just "conceivable," likelihood of a different outcome. *Richter*, — U.S. at —, 131 S. Ct. at 792.

Petitioner argues the deficiencies of his trial counsel severely prejudiced him because there is a great probability that he would have been acquitted had his trial counsel known about his psychiatric history, mental illness, and retardation, had properly investigated all facts and defenses related thereto, had sought an independent psychiatric evaluation, and raised the insanity defense. He submits that, at the minimum, there would have been doubt cast on the reliability of Petitioner's statement to the police and the jury may either not have believed its veracity or accorded it so little weight that Petitioner would have been acquitted.

Petitioner submitted to the Michigan Court of Appeals the affidavit of Dr. Miller, which indicates that Dr. Miller reviewed various psychiatric and psychological records of Petitioner and the report of Dr. Kolito.[5] Dr. Miller, however, did not personally interview Petitioner. Dr. Miller

---

[5]The district court appropriately summarized the affidavit as follows:

After Petitioner's conviction and sentence, Dr. Steven Miller reviewed various psychiatric and psychological records of Petitioner, as well as the report prepared by Dr. Kolito, which had found Petitioner competent to stand trial. Dr. Miller did not personally interview Petitioner. In his affidavit, Dr. Miller indicated that after reviewing Petitioner's prior psychiatric records, he was unable to "surmise, speculate, and/or conclude" the following about Petitioner's "possible neurological status, psychological adjustment and mental status at the time of his alleged crimes and prior

was able to "surmise, speculate and/or conclude the following about [Petitioner's] possible neurological status, psychological adjustment and mental status at the time of his alleged crimes and prior to and during his trial, and his overall developmental and cognitive functioning capacities": that "there are very strong indications that [Petitioner] suffers from what is legally defined as a 'mental illness,'" and that Petitioner, "quite possibly, suffers from 'Mental Retardation' as this term is defined by law" (R. 2 Ex. 3A ¶¶ 3–5). In addition, Dr. Miller found that Petitioner's "mental functioning at the time of the alleged commission of these offenses may have rendered him unable to appreciate the nature of the wrongfulness of his conduct and/or resulted in his lack of capacity to conform his behavior to the requirements of the law." (*Id.* ¶ 4; *see also id.* ¶ 5).

### a. Insanity Defense

Under Michigan law, legal insanity is determined with respect to the moment where the defendant "commit[s] the acts constituting the offense." Mich. Comp. Laws § 768.21a. The defense of insanity "requir[es] proof that, as a result of mental illness or being mentally retarded as defined

---

to and during his trial, and his overall developmental cognitive functioning capacities (i.e., basis intelligence, attention and mental focus, memory, judgment, decision making abilities, affective stability, behavior control capacity, learning capacity, reality testing, and over-all social and emotional adjustment)." Dr. Miller concluded "that there are very strong indications that [Petitioner] suffers from what is legally defined as 'mental illness,'" that Petitioner "quite possibly, suffers form 'Mental Retardation' as this term is defined by law," and that Petitioner's mental functioning "may have rendered him unable to appreciate the nature and wrongfulness of his conduct and/or resulted in his lack of capacity to conform his behavior to the requirements of the law."

*Brown v. McKee*, 2007 WL 2050350, at *8 (alteration in original and citations omitted).

in the mental health code, the defendant lacked 'substantial capacity either to appreciate the nature and quality of the wrongfulness of his or her conduct or conform his or her conduct to the requirements of the law.'" *People v. Carpenter*, 627 N.W.2d 276, 280 (Mich. 2001) (citation omitted). "The defendant has the burden of proving the defense of insanity by a preponderance of the evidence." Mich. Comp. Laws § 768.21a(3).

To warrant habeas relief, Petitioner must "show that he had a substantial defense, and that failure to present that defense rendered the trial fundamentally unfair or unreliable." *Walker v. McQuiggan*, 656 F.3d 311, 321 (6th Cir. 2011) (citations and footnote omitted). Dr. Miller's conclusions regarding Petitioner's mental functioning at the time of the offenses are not unequivocal, *see Fisher v. Smith*, 126 F. App'x 275, 282 (6th Cir. 2005) (finding the equivocal testimony of the same doctor regarding the petitioner's alleged insanity "insufficient to establish a reasonable probability that, but for trial counsel's deficient performance, the outcome of the trial might have been different"), and indeed, he did not personally review Petitioner. Moreover, Petitioner's statement to the police that he "was sorry the man got shot" indicates that Petitioner could appreciate the wrongfulness of his conduct. This statement alone could have undermined any claim of legal insanity. In sum, although it is conceivable that there may have been a different result had trial counsel investigated and raised the insanity defense, Petitioner has not demonstrated that there was a substantial likelihood of a different outcome had he done so.

### b. Competency to Stand Trial

Under Michigan law, a defendant is presumed competent to stand trial and "shall be determined incompetent to stand trial only if he is incapable because of his mental condition of understanding the nature and object of the proceedings against him or of assisting in his defense in a rational manner." Mich. Comp. Laws § 330.2020(1). A defendant "is not prejudiced by counsel's failure to seek a competency evaluation, absent an actual basis to support a claim of incompetency at the time of the proceeding." *Bair v. Phillips*, 106 F. Supp. 2d 934, 941 (E.D. Mich. 2000) (citations omitted).

Petitioner has offered no evidence that he was acting abnormally during the pre-trial or trial proceedings. *See Bair*, 106 F. Supp. 2d at 942. Moreover, a review of the transcript from the *Walker* hearing reveals that Petitioner testified rationally and clearly regarding the circumstances surrounding the taking of his statement to the police. Further, Dr. Kolito found Petitioner competent to stand trial, and his conclusion was based upon his interview of Petitioner and numerous psychological tests performed on Petitioner. Although he noted Petitioner was "malingering" at times, he also noted that Petitioner's physical movements were well coordinated, that he spoke easily and fluently, that his thought patterns were coherent and his responses direct and to the point, that his attention and concentration were undisturbed, and that he was properly oriented as to time, place, and persons, and in his relation to reality. He noted Petitioner could discuss his statement, and that he understood his legal situation, issues, and procedures. Thus, at the time of the proceeding, there was no actual basis to support a claim of incompetency. *See*, *e.g.*, *Bainter v Trickey*, 932 F.2d 713,

716 (8th Cir. 1991) (finding habeas petitioner unable to establish prejudice as a result of his trial counsel's failure to raise competency before the state court because petitioner's trial testimony was "lucid[,] . . . minutely detailed . . . and responsive" (alteration in original)). Petitioner, therefore, was not prejudiced by counsel's failure to investigate and raise competency to stand trial.

### III.  CONCLUSION

For the reasons explained herein, we **AFFIRM** the judgment of the district court.

**MERRITT, Circuit Judge, concurring.** I concur in the court's opinion because Article III judges have so little room left for judgment now under the AEDPA standard which a unanimous Supreme Court has recently described as allowing habeas only "as a guard against extreme malfunctions in the state criminal justice systems and not as a means of error correction." *Greene v. Fisher*, 132 S. Ct. 38, 43 (2011) (internal quotation marks omitted). Thus, the fact that the petitioner did not receive effective counsel must also rise to the level of an "extreme malfunction" of the system of criminal justice. I assume that this now means not only a constitutional error but also an unconscionable result. The case does not rise to that level.

      **COLE, Circuit Judge.** Concurs in both the opinion of the court and in the separate concurrence.