RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 11a0031p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

DANIEL BARRY COUCH,

        *Petitioner-Appellee,*

    *v.*

No. 09-2230

RAYMOND BOOKER,

        *Respondent-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 06-15119—Arthur J. Tarnow, District Judge.

Argued: October 20, 2010

Decided and Filed: February 3, 2011

Before: MOORE, SUTTON and FRIEDMAN,[*] Circuit Judges.

_____

**COUNSEL**

_____

**ARGUED:** Brian O. Neill, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Carole M. Stanyar, Plymouth, Michigan, for Appellee. **ON BRIEF:** Brian O. Neill, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Carole M. Stanyar, Plymouth, Michigan, for Appellee.

_____

**OPINION**

_____

SUTTON, Circuit Judge. A Michigan jury convicted Daniel Couch of second-degree murder, for which he is serving a 19-to-40 year sentence. The district court granted Couch's petition for a writ of habeas corpus. Because Couch's counsel rendered

---

[*] The Honorable Daniel M. Friedman, Senior Circuit Judge of the United States Court of Appeals for the Federal Circuit, sitting by designation.

ineffective assistance by failing to investigate a causation defense, and because the state courts' contrary conclusion violated the standards of the Anti-Terrorism and Effective Death Penalty Act, we affirm.

I.

"This case arises from an incident that occurred when a party went awry." *People v. Collar*, Nos. 233161, 233176, 2003 WL 21465335, at *1 (Mich. Ct. App. June 24, 2003). On June 16, 2000, Jack Thompson joined a party at his friend Susan's house. He had been drinking beer and smoking marijuana, and he had just gone to get some cocaine. "[T]he line of cocaine that [Jack] did was extremely large," and he used still more cocaine after that, eventually getting "a little out of control." R.14 at 51–53. He made "really, really bizarre grunting noises . . . and [was] crawling around on his knees." *Id.* at 53.

Two of the women there snuck out of the apartment and one of them, Allison, called her friends Matt and Kevin, saying, "I have a situation, can you just [come] up here and help us?" *Id.* at 62–63. Both men soon arrived with others in tow, including Daniel Couch. At the time, Couch lived with his nephew in the same house where Allison and Kevin rented rooms. When Kevin received Allison's call, Couch agreed to come along. At the door, they met Rick Collar, Susan's neighbor, and when they all entered the apartment, Susan was "on the floor with her dress wrapped up around her waist and no underwear on, on her knees crying," and Jack was "directly behind her on his knees as well." *Id.* at 72, 77. Susan was "telling Jack to leave her alone and . . . yelling, 'get off of me, stay away from me, leave me alone, help me.'" *Id.* at 76–77.

Allison entered first and pushed Jack to the ground. Collar and Couch grabbed Jack and pulled him away, and Collar punched him repeatedly. Couch also hit Jack during the scuffle. Jack fought back, but he was unable to resist the two men as they pulled him out of the apartment and onto the lawn. Collar "kept hitting [Jack] in the face, telling him that he would f—ing kill him if he ever touched [Susan] again." *Id.* at 95. During the melee, Couch punched Jack "[a]bout five to seven times," R.15-2 at 288, and kicked him once. People yelled, "he's had enough, leave him alone," and a neighbor

shouted from a nearby balcony that she had called the police. R.14 at 95–97. Couch got into a car with Allison, Shannon and two of the other guys, and they drove away. The police arrived, and Collar "raise[d] his hands and [said], 'I'm the one who did it, I'm the one who kicked the sh— out of Jack.'" R.15-2 at 300. Further investigation led the police to Couch as well.

Medics took Jack by ambulance to the hospital, where Dr. Robert Aranosian received him, but "basically he was dead when he got there." R.15 at 10. Jack's heart showed evidence of a "chronic" "[t]hickening of the heart muscle," which was "possibly [the] result of some pathogenic or affect of some drugs." *Id.* at 147–48. The toxicology report showed a .17 blood-alcohol level, noticeable levels of "cannabinoids" from marijuana use and significant levels of cocaine and cocaethlyne, "a compound of cocaine and alcohol created by the cells of the liver [that] has [a] more prolonged affect on [the] human body . . . than cocaine in the sense of duration of the effect." *Id.* at 149–50. There was also blood in Jack's lung tissue, which led Dr. Ljubisa Dragovic, who performed the autopsy, to conclude that the cause of death was "asphyxia from inhaled blood that resulted from blunt-force injury to the face." *Id.* at 176.

The State charged Collar and Couch with second-degree murder and tried them together. On the second day of deliberations, the jury found Couch and Collar guilty.

On direct appeal, Couch argued that his trial counsel was constitutionally ineffective and that the trial court violated his constitutional right to the counsel of his choice. The court of appeals affirmed his conviction, rejecting both claims on the merits, and the Michigan Supreme Court denied review. Couch filed a motion for post-conviction relief under Mich. Ct. R. 6.500, but the state court denied the motion, noting it would not revisit the issues addressed on direct appeal. The Michigan Court of Appeals denied leave to appeal, and so did the Michigan Supreme Court.

Couch filed a habeas petition in the United States District Court for the Eastern District of Michigan, claiming he was denied his counsel of choice and that he received ineffective assistance of counsel. After a two-day evidentiary hearing, the court granted the writ on both grounds.

II.

Under the Antiterrorism and Effective Death Penalty Act, a federal court ruling on a habeas petition must give deference to the state court's resolution of each claim. It may not grant relief with respect to "any claim that was adjudicated on the merits in state court" unless the state court's resolution was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). We give fresh review to claims not "adjudicated on the merits in state court," *id.*, though we still defer to any relevant state court findings of fact, *see Williams v. Coyle*, 260 F.3d 684, 706 (6th Cir. 2001); 28 U.S.C. § 2254(e). To the extent "new, substantial evidence supporting a habeas claim [has] come[] to light during the proceedings in federal district court," we have not applied the deference described in § 2254(d) "to an earlier, state-court . . . adjudication involving a different mix of [relevant] evidence." *Brown v. Smith*, 551 F.3d 424, 429 (6th Cir. 2008).

In *Harrington v. Richter*, — U.S. —, 131 S. Ct. 770 (2011), the Supreme Court recently emphasized that under § 2254(d) a petitioner must establish that "there was no reasonable basis for the state court to deny relief," even where the state courts have not issued any opinion explaining why relief was denied. *Id.* at 784. The decision may raise questions about the scope of § 2254(d)'s strictures, but we need not address these questions today, as we conclude that the Michigan courts' rejection of Couch's ineffective-assistance claim "involved an unreasonable application of[] clearly established Federal law, as determined by the Supreme Court," § 2254(d)(1).

A.

*Evidentiary hearing.* The State argues that the district court should not have granted an evidentiary hearing to Couch, but the objection comes too late. When Couch filed his motion for an evidentiary hearing, the State did not respond. As required by Rule 8(a) of the Rules Governing § 2254 Cases, the district court "review[ed] the answer, . . . transcripts and records of state-court proceedings, and . . . materials submitted under Rule 7 to determine whether an evidentiary hearing [was] warranted."

Noting that the State had "not disputed" Couch's account of the facts, but ensuring that his assertions were "consistent with the record," R.43 at 2, the court concluded that Couch had diligently pursued his claims in state court and granted the hearing. On this record, the district court did not abuse its discretion in granting an evidentiary hearing. *See White v. Mitchell*, 431 F.3d 517, 533 (6th Cir. 2005).

Even if for the sake of argument we had discretion to revisit the issue, *see Williams v. Norris*, 576 F.3d 850, 860 (8th Cir. 2009); *but see Williams v. Hobbs*, 131 S. Ct. 558 (2010) (Sotomayor, J., dissenting from denial of certiorari), we would not do so here, for it is by no means clear that a timely objection by the government would have succeeded. Section 2254(e)(2) says:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant can show that—
>
> > (A) the claim relies on—
> >
> > > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> > >
> > > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> >
> > (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

The requirements of Subsections (A) and (B) apply only if the petitioner "has failed to develop the factual basis of a claim," § 2254(e)(2), only if in other words "there is a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel," *Williams v. Taylor*, 529 U.S. 420, 432 (2000).

Couch diligently presented these claims to the state courts. When Couch received a *Ginther* hearing—the Michigan process for developing facts to support an ineffective-assistance claim, *see People v. Ginther*, 212 N.W.2d 922 (Mich. 1973)—he

objected to the way his appellate counsel proceeded, then filed a pro se motion for a new hearing so that he could introduce the evidence that he later introduced before the district court. *See Sawyer v. Hofbauer*, 299 F.3d 605, 610 (6th Cir. 2002). He retained new counsel and continued to seek a new hearing while requesting permission to submit new briefs on appeal. The state court agreed to strike his prior counsel's briefs and to allow him to file new briefs, but it did not give him a new *Ginther* hearing. Even after the Michigan Court of Appeals affirmed his conviction, he moved the court to reconsider and continued to press his ineffective assistance of counsel claim. In the collateral state court proceedings, Couch once again sought to introduce the evidence presented below, but again to no avail. *See Greer v. Mitchell*, 264 F.3d 664, 681 (6th Cir. 2001). All of these efforts considered, Couch appears to have diligently presented his claims to the state courts, making it difficult to maintain that the district court abused its discretion in granting the hearing.

B.

*Ineffective assistance of counsel*. "In all criminal prosecutions," the Sixth Amendment says, "the accused shall enjoy the right . . . to Assistance of Counsel for his defence," U.S. Const. amend. VI, a requirement that applies to the States through the Fourteenth Amendment, *Gideon v. Wainwright*, 372 U.S. 335, 342–43 (1963). A right to the assistance of someone with a law degree does not by itself suffice. Only a right to "effective assistance of counsel" serves the guarantee. *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). To establish a claim of ineffective assistance of counsel, a defendant must show that "counsel's representation fell below an objective standard of reasonableness," *Strickland v. Washington*, 466 U.S. 668, 688 (1984), and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694.

*Counsel's Representation Fell Below an Objective Standard of Reasonableness*. The state courts unreasonably rejected Couch's argument that his counsel should have investigated his causation defense. Competent counsel can be expected to undertake a "thorough investigation of law and facts relevant to plausible options" for the defense.

*Id.* at 690.  And while this does not require counsel to investigate every conceivable defense, any limitation on counsel's investigation must be supported by a "reasonable professional judgment[]." *Id.* at 691.  Couch's counsel, Raymond Correll, knew several facts that made a causation defense a "plausible" option:  that the victim had a heart condition, that his blood showed high levels of alcohol, marijuana and cocaine and that the medics had to restrain him.  Making matters worse, Couch not only told Correll to pursue the defense but also told him how to do so:  by obtaining the fire department report about the incident.  That the report was readily accessible makes Correll's reluctance to ask for it all the more inexcusable and all the more removed from a "reasonable professional judgment[]."  To make a reasoned judgment about whether evidence is worth presenting, one must know what it says.  While the point of the Sixth Amendment is not to allow Monday-morning quarterbacking of defense counsel's strategic decisions, a lawyer cannot make a protected strategic decision without investigating the potential bases for it.  *See id.* at 690–91; *see also Bigelow v. Harviland*, 576 F.3d 284, 288 (6th Cir. 2009).  It is particularly unreasonable to fail to track down readily available and likely useful evidence that a client himself asks his counsel to obtain.  *See Bigelow*, 576 F.3d at 287–88.

In rejecting Couch's claim, the Michigan Court of Appeals credited Correll's concern that introducing the report "would emphasize the decedent's fear and the effect of the attack" on him and concluded that these considerations sufficed to cut short further investigation of this causation defense.  *Collar*, 2003 WL 21465335 at *5.  But the State already had presented considerable evidence about the effect of the beating on Jack, which cast a far worse light on the defendants than the fire department report would have.  Even if this kind of fear might justify omitting the evidence at trial in some circumstances, that is no reason not to *read* the report.  How can one exercise reasonable professional judgment about whether to stop a causation-based investigation before reading the key report that might support it?

The State responds that a defense lawyer may rely on its expert witnesses to gather information like this.  It notes that the defendant's medical expert, Dr. Spitz,

agreed with Dr. Dragovic's determination that the cause of death was asphyxiation resulting from the beating, and that Dr. Spitz never asked Correll for any additional information.  But Dr. Spitz never saw the fire department report in making this assessment, and he never spoke with Correll about this or any other evidence.  An attorney cannot hire an expert, give him whatever evidence he happens to have on hand (but not the evidence the client pointed to) and accept the report without further discussion.  Trial counsel may rely on an expert's opinion on a matter within his expertise when counsel is formulating a trial strategy.  *See, e.g.*, *Campbell v. Coyle*, 260 F.3d 531, 555 (6th Cir. 2001); *Lewis v. Alexander*, 11 F.3d 1349, 1353 (6th Cir. 1993).  But this common-sense principle does not give trial counsel a free ride when it comes to the obligation to undertake a "thorough investigation of law and facts relevant to plausible options" for a defense.  *Strickland*, 466 U.S. at 690; *see Bigelow*, 576 F.3d at 287–88.

Correll had no way of knowing, without first looking at the fire department report, whether he might (or might not) need an expert's assistance to understand how the report could support an alternative causation theory.  Hiring a medical expert to review an autopsy report does not amount to the outsourcing of all investigation into plausible causation theories, including a theory that may have nothing to do with the autopsy report.  What if the fire department report had shown that someone else was the assailant?  That would just as readily support a causation defense, and it would be just as irrelevant to Dr. Spitz's evaluation of the autopsy report.  So too here:  Couch could have benefitted from the fire department report even without an expert to explain its significance.  At the very least, the report, which indicates that Jack was conscious when emergency services arrived and that his mouth and nose were *not* flooded with blood, could have rebutted the State's repeated assertion at trial that Jack "drowned in his own blood."  R.16 at 24; *see also id.* at 25–26, 95–97.  The hiring of Dr. Spitz does not exonerate Correll from the duty to take these simple steps.  On this record, the state courts unreasonably concluded that Correll provided adequate counsel.

*Couch Was Prejudiced by Counsel's Ineffective Representation.*  In rejecting Couch's claim, the Michigan Court of Appeals considered the alternative causation theory that Couch pursued in his *Ginther* hearing—"restraint-related asphyxia"—and concluded that "the evidence failed to show a reasonable probability that such a theory would have been successful."  *Collar*, 2003 WL 21465335 at *5.  But in the district court, Couch pursued a different theory of causation:  that Jack died from a pulmonary edema caused by a cocaine overdose, not from asphyxiation.  Couch also presented expert testimony refuting the State's theory that Jack "drowned in his own aspirated blood."  Habeas Hearing at 32.  In the light cast by this evidence, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  Indeed, "[t]he likelihood of a different result [is] substantial," *Richter*, 131 S. Ct. at 792, confirming that the state court's contrary conclusion unreasonably applied *Strickland*.

*Rompilla v. Beard*, 545 U.S. 374 (2005), supports Couch's claim of prejudice.  After holding that counsel's failure to obtain and investigate court files about Rompilla's prior conviction amounted to ineffective assistance, *id.* at 383, the Court found prejudice.  "If the defense lawyers had looked in the file," the Court reasoned, "they would have found a range of mitigation leads that no other source had opened up."  *Id.* at 390.  "With this information," the Court added, "counsel would have become skeptical of the impression given by" their cursory investigation "and would unquestionably have gone further to build a mitigation case.  Further effort would presumably have unearthed much of the material postconviction counsel found, including testimony from several [potential witnesses], whom trial counsel did not interview."  *Id.* at 391.  "This evidence," the Court concluded, "adds up to a mitigation case that bears no relation to the [minimal mitigation evidence] actually put before the jury, and although we suppose it is possible that a jury could have heard it all and still have decided [as it did], that is not the test."  *Id.* at 393.

Couch faced a similar situation.  The fire department report alone would have aided his defense, as it contained information rebutting the drowned-in-his-blood theory

of causation. But that is not all. The report, as in *Rompilla*, would have led reasonable counsel to the same evidence that Couch's postconviction counsel found, which was "easy to get" and which reasonably diligent trial counsel "would presumably ha[ve] unearthed." *Id.* at 391, 393. The fire department report showed that Jack was conscious when emergency services arrived, that he fought back when they tried to put him into the ambulance and that "there was no return of blood or food" in Jack's upper airway when he was taken into the ambulance. Habeas Hearing at 22. When shown the fire department report along with the other medical evidence available before trial, Dr. John Butt, Couch's medical expert at the district court's evidentiary hearing, did not believe that Jack "drowned in his own aspirated blood." *Id.* at 32. He testified that the evidence did not show a "significant quantity of aspirated blood" that would be "sufficient to have caused a severely compromised situation to the point of killing the individual." *Id.* at 32–33. This fact, combined with the circumstances of the incident and other medical evidence, including signs of pulmonary edema, led Dr. Butt to believe that Jack died of "cardio respiratory failure due to primary pulmonary [h]emorrhage from cocaine toxicity," or in other words an "accidental" cocaine overdose, not from asphyxia caused by the beating. R.4 at 8–9.

The fire department report also led Couch's new counsel to interview two EMTs from the Independence Township Fire Department, including the author of the report. In their testimony, they remembered that "the patient respond[ed] by speaking," Habeas Hearing at 150, that they "could hear him breathing" while he was being "wheeled to the ambulance," *id.* at 176; *see also id.* at 154, and that he was never "visibly choking or choking up blood," *id.* at 156. This evidence too would have rebutted the notion that Jack "drowned in his own blood," R.16 at 24, paving the way for an alternative theory of causation.

Even Correll's testimony supports this conclusion. Had he seen "the first responders' report or reports," which said "that there was no fluids in the airway," and had he been able to obtain "an independent" witness who could "corroborate that and

say, Dragovic, you're wrong," he acknowledged that he "would [have] raise[d] it at that point."  Habeas Hearing at 253–54.

Dr. Dragovic's testimony at the evidentiary hearing comes to the same end.  He agreed that Jack's lung tissue "show[ed] signs of pulmonary edema"—Couch's alternative theory of causation.  Habeas Hearing at 98.  He testified that he "did not find any blood in the stomach," and that if someone were conscious and gurgling blood, "[i]t's more likely that they will swallow" some blood.  *Id.* at 103.  He also backed down from the drowning analogy for asphyxiation by blood, saying it "is a completely different thing."  *Id.* at 99.  He had meant to suggest, he now says, only that "the mechanism of inhalation is the same."  *Id.* at 100.  It is otherwise "impossib[le]," he explained, "to compare blood that is inhaled with water that is inhaled."  *Id.*

Taken as a whole, "[t]his evidence adds up to a [causation defense] that bears no relation to the [evidence] actually put before the jury."  *Rompilla*, 545 U.S. at 393.  To get a flavor of why this is so, consider the prosecution's opening and closing statements.  In opening, the prosecution hints at the drowned-in-his-blood theory:

> And Dr. Dragovic then performs an internal examination.  He knows that there's a significant amount of blood in Jack's nose and in his mouth and he also notes now that Jack has inhaled some of his own blood.  It's in the upper airways, it's also in the lower airways.  And the effect of this, of course, is to diminish his ability to breathe.

R.13 at 138–39.  But by the closing argument, after the unrebutted testimony of Dr. Dragovic's and his analogy to drowning, here is what the jury hears:

> Jack Thompson drowned in his own blood.  He drowned in his own blood.
>
> They beat him so hard that his nose was bleeding, his mouth was full of blood, his upper airways are full of blood, the lower airways are full of blood, the little air sacs, the sacs that are suppose[d] to carry the life-giving oxygen, instead they are filled with blood.

R.16 at 24.  More:

> He caused the death—both of these men caused the death because they hit him in the face. The blood is from the nose. It goes into the mouth. He drowned on his own blood. That's the cause of death. That's why this man died. He drowned on his own blood.

R.16 at 95–96; *see also id.* at 25–26, 96–97.

What seemed to be a simple explanation for the State's theory of causation was not so simple and, if the jury had believed the new evidence, it was not even true. The fire department report and the evidence that came with it cast considerable doubt on the drowned-in-his-blood theory of causation. As shown, moreover, another theory of causation existed. Jack had a "chronic" "[t]hickening of the heart muscle" "possibly [the] result of some pathogenic or affect of some drugs," R.15 at 148, and he had a .17 blood-alcohol level, signs of marijuana use and significant levels of cocaine and cocaethlyne. *Id.* at 149–50. If someone had explained to them, as Dr. Butt would have, that death caused by these factors was not only consistent with the autopsy results, but that this was the most likely cause of death, "at least one juror [might] have struck a different balance." *Wiggins*, 539 U.S. 510, 537 (2003).

This is particularly true in view of "the lack of overwhelming evidence of guilt" with respect to Couch. *English v. Romanowski*, 602 F.3d 714, 730 (6th Cir. 2010). The trial record shows that the State's case against Couch—as opposed to Couch's co-defendant, Collar—was not strong. Reading the inferences in favor of the prosecution, the most that can be said in favor of this second-degree murder conviction is that a neighbor watching from a balcony saw Couch kick Jack "hard enough to move his body," R.14-2 at 267, and another partygoer saw him hit Jack "[a]bout five to seven times," R.15-2 at 288; *see also* R.14 at 185. Others, however, testified that Couch merely "slapped him open handed" and "kicked his hands away" when Jack tried to grab Couch's legs. R.15 at 83. Several witnesses had imperfect recollections of events or could not identify Couch in person. There was no evidence of premeditation or anything else suggesting he meant to kill the victim.

Contrast this with the evidence against Collar, his co-defendant. Collar told his date that "he was going to kick Jack's a—" before he landed the first blow. R.14 at 140.

He then "punch[ed Jack] repeatedly in the face" "at least 25 times," R.15-2 at 268, and, when the police arrived, he acknowledged, "I'm the one who did it, I'm the one who kicked the sh— out of Jack," R.15-2 at 300.  Just as the difference in the degree of culpability between two defendants may raise the risk of prejudice to the least culpable individual, *cf. Zafiro v. United States*, 506 U.S. 534, 539 (1993), so it is true that the least-culpable defendant is most likely to be prejudiced by a flawed presentation of a theory of causation.  Had Couch presented his alternative causation theory at trial, there is a reasonable probability, at least for him, that the jury would not have found beyond a reasonable doubt that he was responsible for Jack's death.  In the last analysis, "had the jury been confronted with this . . . evidence, there is a reasonable probability that it would have returned with a different [verdict]." *Wiggins*, 539 U.S. at 536.  In reaching a contrary conclusion, the state courts unreasonably applied *Strickland*.

C.

*Counsel of Choice*.  The district court also held that the state trial court violated Couch's right to counsel of choice when it denied his motion for a continuance on the eve of trial, a motion designed to give him time to find new counsel after his initial choice backed out.  Because the district court properly issued the writ on the ineffective assistance of counsel claim, we need not address this alternative ground for relief.

III.

For these reasons, we affirm.