*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JAMES DAVID ALLAN,

        Defendant-Appellant.

UNPUBLISHED
April 11, 2024

No. 359131
Lenawee Circuit Court
LC No. 2020-020150-FC

Before: RIORDAN, P.J., and O'BRIEN and MALDONADO, JJ.

PER CURIAM.

Defendant appeals as of right his jury-trial conviction of second-degree murder, MCL 750.317(1)(b).[1] We affirm.

Defendant's conviction arises from the death of his 34-year-old wife, Amy Allan. Defendant claimed that on September 14, 2018, he discovered Amy hanging from the basement rafters in their home with an extension cord wrapped around her neck and attached to a hook in the rafters. Defendant described taking down Amy's body and attempting to resuscitate her until help arrived. After emergency responders were able to establish a pulse, Amy was transferred to a local hospital and then airlifted to the University of Michigan hospital, but she was deemed "brain dead" and eventually died on September 17, 2018.

Responders were skeptical that Amy committed suicide given the height of the ceiling, the fact that the extension cord was still around her neck but not tightly knotted, and that no ligature marks were observed on her neck at the scene despite that defendant had described the cord as having been sunk into her neck. According to responders, defendant's behavior when medical personnel were treating Amy at the scene and his reaction when he learned that she might survive also raised suspicions.

---

[1] The jury acquitted defendant of first-degree premeditated murder, MCL 750.316(1)(a).

-1-

Shortly before Amy's body was discovered, defendant and Amy had an argument at a restaurant. After the argument, defendant drove home, but Amy walked. There was no activity associated with Amy's cell phone and Apple Watch after the time she would have returned home. Defendant claimed to have discovered her body in the basement less than an hour after she returned to the home.

The parties did not dispute that Amy died by asphyxiation, but they disputed the manner of her death. The prosecution's theory at trial was that defendant choked Amy from behind using his elbow in a "rear naked chokehold," and then staged the scene to make it look like a suicide by hanging. The prosecutor argued that defendant was very controlling of Amy and their daughter. Amy had no history of medical or mental health problems, prior suicide attempts, or drug or alcohol abuse. She had two children but did not leave a note. The prosecution presented evidence that Amy was having an affair with another man and had made plans on the day she died to meet the other man in October 2018. The prosecution also presented expert testimony that the electrical cord found around Amy's neck did not show signs of damage consistent with what the expert would have expected if the cord had been used as part of a direct-drop or forward-leaning suspension.

The defense theory at trial was that Amy committed suicide. The defense claimed that the family had lived in Michigan for approximately a year after moving from Florida and that Amy was having a difficult time adjusting to living away from her family. A dispute involving her son also led to her estrangement from her family. Defendant presented evidence that Amy had assumed another identity online, began a relationship with another man, became more isolated, did not leave her home, and began drinking more. Defendant argued that these factors apparently caused Amy to take her own life.

The defense emphasized that the physician who performed the autopsy declined to rule that Amy's death was a homicide. In opening statement, defense counsel explained that the defense intended to call Dr. Francisco Diaz, a forensic pathologist and chief medical examiner in Washington, D.C., who would support their theory that Amy's death was a suicide by hanging. On the day before Dr. Diaz was scheduled to testify, however, he had a medical emergency that required his hospitalization. After considering and exploring different options, defense counsel, in lieu of requesting an adjournment, offered to introduce an opinion letter that Dr. Diaz had prepared months before trial. In that letter, Dr. Diaz expressed his opinion that, after reviewing all of the available evidence, Amy's death was most consistent with a low-suspension hanging rather than caused by the actions of another person. The prosecutor agreed to stipulate to the admission of the letter, which was read to the jury.

The jury acquitted defendant of first-degree premeditated murder but found him guilty of second-degree murder. After trial, defendant filed a motion for a new trial, supported by a postconviction declaration from Dr. Diaz that further explained his reasons for concluding that Amy's death was the result of a suicidal hanging. Dr. Diaz also represented that he would have been available to testify by Zoom the week after he was scheduled to appear, but he was never contacted. Defendant argued that trial counsel was ineffective for introducing Dr. Diaz's opinion letter at trial without first requesting an adjournment to determine if Dr. Diaz would have been able to testify the following week. He further argued that he was deprived of his constitutional right to present a defense by not being able to provide Dr. Diaz's live testimony at trial, and that

the information in Dr. Diaz's postconviction declaration constituted newly discovered evidence supporting his request for a new trial. After conducting a *Ginther*[2] hearing, the trial court denied defendant's motion. This appeal followed.

## I. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that trial counsel failed to properly respond to Dr. Diaz's sudden unavailability due to a personal medical emergency, and that counsel's deficient handling of that matter deprived defendant of the effective assistance of counsel. The trial court denied defendant's motion for a new trial on this ground after the *Ginther* hearing.

Claims of ineffective assistance of counsel generally involve mixed questions of law and fact. *People v LeBlanc,* 465 Mich 575, 579; 640 NW2d 246 (2002). The trial court's findings of fact are reviewed for clear error, and its constitutional determination whether the defendant was denied the effective assistance of counsel is reviewed de novo. *Id*.

To establish ineffective assistance of counsel, defendant must first establish that counsel's performance was deficient, which involves consideration of "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *People v Leffew*, 508 Mich 625, 637; 975 NW2d 896 (2022), quoting *Strickland v Washington*, 466 US 668, 690; 104 S Ct 2052; 80 L Ed 2d 674 (1984) (quotation marks omitted). Defendant must also demonstrate that he was prejudiced by counsel's error. To establish prejudice, defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Leffew*, 508 Mich at 637, quoting *Strickland*, 466 US at 694 (quotation marks omitted). A "[r]easonable probability means 'a probability sufficient to undermine confidence in the outcome.' " *Leffew*, 508 Mich at 637, quoting *Strickland*, 466 US at 694. Defendant has the burden of establishing the factual predicate for his ineffective-assistance claim. *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001).

"Decisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy, and this Court will not substitute its judgment for that of counsel regarding matters of trial strategy." *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002). A defendant must overcome a strong presumption that his attorney exercised sound trial strategy. *Id*. at 368-369. But "a court cannot insulate the review of counsel's performance by calling it trial strategy." *People v Douglas*, 496 Mich 557, 585; 852 NW2d 587 (2014). Counsel's strategy "in fact must be sound, and counsel's decisions as to it objectively reasonable." *Id.*

The record here does not support any suggestion that defense counsel failed to adequately investigate this case or was unprepared to respond to the prosecution's evidence. The trial transcript and the testimony at the evidentiary hearing clearly show (1) that defense counsel was aware of the strengths and weaknesses of the prosecution's theory that defendant intentionally caused Amy's death by asphyxiation by applying a rear naked chokehold and then staged the scene

---

[2] *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973).

to make it look like a suicide, and (2) that counsel was prepared to present expert testimony to rebut the prosecution's theory and support the defense theory that Amy committed suicide by hanging. This case is therefore distinguishable from *Couch v Booker*, 632 F3d 241 (CA 6, 2011), cited by defendant. There, the court found that the defendant's counsel was ineffective for failing to obtain a known fire-department report that could have rebutted the prosecution's theory regarding the cause of the victim's death. *Id*. at 246-248. There is no indication in this case that defense counsel failed to investigate any evidence or was otherwise unprepared for trial.

Along similar lines, the record does not support that defense counsel failed to investigate the significance of Amy's thyroid cartilage tip fracture, contrary to what defendant asserts. Although the prosecution's experts, Dr. Jeffrey Jentzen and Dr. Bader Cassin, both agreed that a thyroid cartilage tip fracture can occur if pressure is applied to the neck (including from a rear naked chokehold), neither was able to determine the actual cause of Amy's fracture. Dr. Jentzen, moreover, agreed that it is "common" to see a thyroid cartilage tip fracture in suspended ligature hangings; he estimated that approximately 25% of all hangings will result in some type of fracture to either the hyoid or thyroid cartilage. On cross-examination, defense counsel elicited Dr. Jentzen's agreement that the ligature in suspension hangings would be expected to ride up on top of the thyroid cartilage, which counsel then clarified "is where she had the fracture." Dr. Cassin, conversely, disagreed with Dr. Jentzen's testimony that cartilage tip fractures are common in suspension hangings, and he testified that he had "rarely" seen such fractures in hanging autopsies that he had conducted. On cross-examination, however, defense counsel used two treatises to impeach Dr. Cassin's testimony regarding the percentage of thyroid cartilage fractures found in suspension hangings. One study found a thyroid cartilage fracture in 25% of such cases, and another in 34% of such cases. Defense counsel confronted Dr. Cassin with these studies, and he responded that he was surprised by the findings because they were not consistent with his own experience. It is clear from this record that defense counsel understood the significance of Amy's thyroid cartilage tip, highlighted evidence that such a fracture can commonly occur with suspension hangings, and was prepared to rebut Dr. Cassin's conflicting opinion that such fractures are rarely seen in suicidal suspension hangings.

Defendant's principal argument, however, does not contest the manner in which defense counsel prepared for trial but the manner in which defense counsel responded to Dr. Diaz's personal medical emergency, which prevented him from testifying at trial. The *Ginther*-hearing record indicates that defense counsel considered several potential options for dealing with this sudden emergency: requesting an adjournment, requesting a mistrial, investigating the possibility of having Dr. Diaz testify remotely, or stipulating to the admission of Dr. Diaz's January 7, 2021 letter in which he offered his opinion that a review of all available evidence indicated that Amy's death was likely the result of a low-suspension hanging. Counsel chose the latter option. We disagree with defendant that counsel's choice of response was not objectively reasonable under the circumstances.

At the *Ginther* hearing, defense counsel testified that he received an e-mail from Dr. Diaz's wife on the night before Dr. Diaz was scheduled to testify, informing him that Dr. Diaz had experienced a medical emergency and would not be available for trial. Defense counsel advised the prosecutor of the situation that night and updated the court the next day. Trial continued the next day with other witnesses, and the court instructed defense counsel to find out more about Dr. Diaz's status. Later that day, counsel spoke to Dr. Diaz's wife, who was also a physician, and she

advised counsel that Dr. Diaz was heavily medicated, could not speak, and may require surgery. She did not know if he would be available for a week or longer. Defense counsel said at the *Ginther* hearing that he discussed the situation with co-counsel and defendant, and they considered different options.

Defense counsel explained that he considered the possibility of requesting an adjournment until the next week to see if Dr. Diaz would possibly be able to testify by Zoom by that time. But based on the information defense counsel had received from Dr. Diaz's wife, he had no reason to believe that Dr. Diaz would be available by the following week. Counsel was additionally aware that the prosecution was unwilling to agree to any extended or indefinite adjournment because there had already been problems with jurors due to the length of the trial and the impact of the COVID-19 pandemic, leading to the loss of two jurors already, and there were concerns about completing the trial with enough jurors. Counsel had also discussed the option of stipulating to the admission of Dr. Diaz's opinion letter with the prosecutor, who was willing to agree to that. Counsel feared, however, that if the case was adjourned and Dr. Diaz was still unable to testify, the prosecutor might no longer be willing to stipulate to admission of the letter, and counsel did not want to risk losing both Dr. Diaz's testimony and the opportunity to present his opinion letter. Counsel also explained that he had additional witnesses who would not be available the next week (including Sergeant Michael Lee, whom counsel considered an important witness for the defense), and an adjournment risked the loss of these additional witnesses. Counsel explained that another option he considered was asking for a mistrial, but counsel did not favor that option because the prosecution would have learned of the defense's strategies and would be more prepared to counter them at a second trial. Counsel, who was retained, added that there was also uncertainty over whether defendant would have sufficient financial resources for a second trial. In the end, counsel decided that the best option was to stipulate to the admission of Dr. Diaz's January 2021 opinion letter, which would inform the jury of Dr. Diaz's opinion that the available evidence was most consistent with a suicide by hanging. Counsel explained that he discussed this option with both defendant and co-counsel, and they were both in agreement with that decision.

The record clearly discloses that defense counsel considered and explored different options for responding to Dr. Diaz's sudden and unexpected unavailability. Counsel's testimony reflects that he was aware that there were certain disadvantages and risks with each of the options he considered. Defendant argues that it was unreasonable for defense counsel to present Dr. Diaz's opinion letter without at least first requesting a brief adjournment to determine if Dr. Diaz might be available to testify the following week. Counsel agreed that it would have been preferable to be able to present Dr. Diaz's live testimony rather than just his opinion letter, but said that, based on the limited information available to counsel at the time, he had no reason to expect that Dr. Diaz would be available by the following week. Counsel also explained that there were other risks with an adjournment, including the potential loss of another important defense witness, Sergeant Lee, if trial was adjourned.

Defendant argues that counsel nevertheless could have continued with the remaining defense witnesses and asked the court for a short adjournment until the following Tuesday to see if Dr. Diaz might be available by then. Defendant emphasizes that Dr. Diaz indicated in his postconviction declaration that, after undergoing clinical treatment in the hospital, he did not require surgery and would have been available to testify by Zoom the following week without a significant delay of trial. Counsel's decisions, however, must be evaluated on the basis of the

information available to counsel at the time the decisions were made, not with the benefit of hindsight. *People v White*, 331 Mich App 144, 149; 951 NW2d 106 (2020). According to the information known to counsel at the time, he had no reason to believe that Dr. Diaz would be available the following week. Counsel explained that he was aware that Dr. Diaz's wife was also a physician, so he attached significance to her opinion that Dr. Diaz would not be available for a week or longer. Counsel also explained that there were other factors that influenced his decision not to request an adjournment, including the prosecution's unwillingness to agree to an indefinite adjournment. He additionally did not want to risk losing the opportunity to at least present Dr. Diaz's opinion letter, which the prosecutor was willing to stipulate to but might not be willing to do if trial was adjourned and Dr. Diaz remained unable to testify. We agree with the trial court that defense counsel's reasons for not requesting an adjournment were objectively reasonable considering the circumstances and information available to counsel at the time.

Defendant argues that it was not objectively reasonable for defense counsel to rely on Dr. Diaz's January 2021 opinion letter to support the defense theory that Amy died from a suicidal hanging because the letter was never intended as a substitute for trial testimony, it did not address other potential causes for Amy's thyroid cartilage tip fracture, and it did not address that hospital staff did not observe the presence of petechiae in Amy's eyes upon examination. Defense counsel acknowledged that Dr. Diaz's January 2021 opinion letter was never intended as a substitute for trial testimony, and, as such, it did not provide the level of detail that trial testimony could have provided. Defendant's argument on appeal, however, ignores that the letter was the only other means that counsel reasonably believed was available at the time for presenting the jury with another expert's opinion that the manner of Amy's death was a hanging by suicide, and not a manual strangulation as claimed by the prosecution.

We also disagree with defendant's suggestion that the letter was not useful in supporting the defense theory of a hanging by suicide. First, in addition to the opinion letter, the jury was presented with Dr. Diaz's curriculum vitae, which apprised the jury of Dr. Diaz's background as a forensic pathologist and medical examiner for more than 20 years. Second, the letter informed the jury of the materials that Dr. Diaz had reviewed before rendering an opinion, which included the death certificate, autopsy report, toxicology report, scene and autopsy photographs, police reports, a rope study report and appendices, and a letter from Dr. Cassin. The jury was thus aware that Dr. Diaz had formed an opinion after considering much of the evidence that was explored at trial. Third, the letter provided Dr. Diaz's specific reasons, based on the factual evidence, for rejecting the likelihood that Amy's death was caused by the actions of another person and was instead better classified as a suicidal hanging. The letter served the purpose of informing the jury that the defense theory of a suicidal hanging was supported by the opinion of another qualified expert.

Although defendant is correct that Dr. Diaz's letter did not identify other potential causes for Amy's cartilage tip fracture, which were mentioned in Dr. Diaz's postconviction declaration, Dr. Diaz did state in his letter that the cartilage tip fracture "does not constitute forensic proof of homicidal ligature strangulation." Moreover, Dr. Jentzen and Dr. Cassin conceded at trial that they did not know what caused Amy's cartilage tip fracture, and Dr. Jentzen admitted that thyroid cartilage fractures are commonly seen in suspension hangings, which defense counsel highlighted. While Dr. Cassin initially testified that cartilage tip fractures were rare in suspension hangings based on his experience, defense counsel confronted him with treatises showing that approximately

25% to 35% percent of suspension hangings involve a thyroid cartilage fracture, which counsel highlighted in his closing argument. Accordingly, the jury was aware, through defense counsel's cross-examination of other witnesses and other evidence, that the actual cause of Amy's thyroid cartilage tip fracture was undetermined and that such fractures can occur in a suspension hanging by suicide. Notably, Dr. Diaz did not deny in his postconviction declaration that a cartilage tip fracture could also have occurred as a result of a rear naked chokehold.

Similarly, although defendant criticizes the usefulness of Dr. Diaz's letter because it did not discuss the significance of the absence of petechiae, defense counsel thoroughly explored that issue in his cross-examination of other witnesses consistent with the degree of detail provided by Dr. Diaz in his postconviction declaration. That letter stated in pertinent part:

> In my opinion, the absence of petechiae significantly undermines the prosecution's trial theory—a choke hold followed by a garroting to stage a hanging—because in that scenario, the heart was still pumping blood to the face. This scenario, in turn, would almost certainly have resulted in petechiae in the eyes and eyelids. However, by all accounts—even those from hospital personnel at Herrick and University of Michigan Hospital the night of the hanging—no petechiae were observed or charted despite the fact that doctors examined her eyes and pupils.

At trial, defense counsel elicited from Dr. Jentzen that approximately 90% of manual strangulations leave petechiae, which Dr. Jentzen had described as tiny hemorrhages that occur when there is some form of compression applied to an organ or structure and are commonly seen in the eyes and eyelids in cases of asphyxia. In response to defense counsel's questioning, Dr. Jentzen admitted that he did not personally see petechiae when he examined Amy's body or see any descriptions of petechiae in the medical reports. Defense counsel also explored this issue in his cross-examination of Dr. Cassin, which led to the following exchange:

> *Q*. I want to talk a little bit about the petechiae for a second. According to those same sources [re: treatises], most suicidal hanging victims don't have petechiae, correct?
>
> *A*. Correct.
>
> *Q*. I want to contrast that with the other two categories, manual strangulation using something, an arm, a hand, or whatever, and ligatures. Put them in one group. The grand majority of victims of those two have petechiae, correct?
>
> *A*. Of manual?
>
> *Q*. Manual or homicidal ligature?
>
> *A*. Homicidal ligature I wouldn't say the majority do. But manual, yes.
>
> *Q*. And I think at exam you talked about, I asked you could it be as high as some of the experts are saying as 89 percent, and you said that could be, yes?

*A.* What were you quoting? That 89 percent were what?

*Q.* Of known manual strangulation victims having petechiae.

*A.* It could be that high, yes.

*Q.* I guess I'll ask, and I think the answer's pretty clear, but in any of your review of the case file in this case from Herrick to University of Michigan to Dr. Jentzen's autopsy, was there any notation of petechiae in Ms. Allan?

*A.* No.

Thus, even though Dr. Diaz's opinion letter did not discuss the significance of the absence of petechiae (which Dr. Diaz more fully addressed in his postconviction declaration), the record discloses that defense counsel was able to elicit the substance of the information in Dr. Diaz's postconviction declaration in his cross-examination of Dr. Jentzen and Dr. Cassin.

In sum, we agree with the trial court that defense counsel's decision to respond to Dr. Diaz's sudden and unexpected absence by offering Dr. Diaz's previous opinion letter was objectively reasonable under the circumstances. The record indicates that counsel considered and explored other potential options for responding to the situation and had legitimate reasons for declining to pursue those options, reasonably believed that Dr. Diaz would not be available to testify anytime soon, and reasonably believed that Dr. Diaz's opinion letter could assist the defense by providing the jury with an opinion from a qualified expert that Amy's death resulted from a suicidal hanging. The fact that Dr. Diaz's opinion letter did not address other potential causes for Amy's thyroid cartilage tip fracture or fully discuss the significance of the absence of petechiae in Amy's eyes did not render counsel's strategy unsound where counsel was able to effectively explore those issues in his cross-examination of other witnesses. Accordingly, the trial court did not err by denying defendant's motion for a new trial on this ground.

## II. OTHER GROUNDS FOR A NEW TRIAL

Defendant next argues that, even if defense counsel was not ineffective, the trial court abused its discretion by denying his motion for a new trial on other grounds, including that he was deprived of his constitutional right to present a defense, that Dr. Diaz's postconviction declaration constitutes newly discovered evidence supporting a new trial, and that a postconviction polygraph examination supported defendant's innocence. We disagree.

A trial court's decision whether to grant a new trial is reviewed for an abuse of discretion. *People v Cress*, 468 Mich 678, 691; 664 NW2d 174 (2003). An abuse of discretion occurs when a trial court's decision falls outside the range of reasonable and principled outcomes. *People v Franklin*, 500 Mich 92, 100; 894 NW2d 561 (2017).

### A. RIGHT TO PRESENT A DEFENSE

Defendant first argues that his inability to present Dr. Diaz's live testimony deprived him of his due-process right to present a defense. The record does not support this argument.

-8-

In *People v Hayes*, 421 Mich 271, 278-279; 364 NW2d 635 (1984), our Supreme Court recognized that a criminal defendant has a state and federal constitutional right to present a defense, but explained that this right is not absolute. The defendant must still comply with "established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Id*., quoting *Chambers v Mississippi*, 410 US 284, 302; 93 S Ct 1038; 35 L Ed 2d 297 (1973) (quotation marks omitted).

Defendant was never prohibited from presenting Dr. Diaz's testimony. As discussed earlier, Dr. Diaz was unable to testify only because a medical emergency prevented him from appearing at trial. To rectify this situation, at defense counsel's request, defendant was allowed to present Dr. Diaz's January 2021 letter expressing his opinion that the manner of Amy's death was a hanging by suicide and not a manual strangulation as claimed by the prosecution. Defendant was never prohibited from offering any evidence in support of his theory of defense. Defendant complains that, without Dr. Diaz's testimony, he was unable to respond to "critical issues" in the case, but the only such issue he identifies is "the cause of [Amy's] thyroid cartilage tip fracture." Again, however, defendant was never prevented from offering evidence on this issue at trial. On the contrary, as explained earlier, defense counsel was permitted to and did explore this issue with other witnesses. Although counsel did not specifically explore all potential causes of the fracture, counsel established that the actual cause of the fracture could not be determined and that such a fracture can occur in suicide suspension hangings, consistent with the defense theory of the case. On this record, defendant was not deprived of his right to present a defense.

## B. NEWLY DISCOVERED EVIDENCE

Defendant also argues that Dr. Diaz's postconviction declaration in which he discussed other potential causes of Amy's cartilage tip fracture constitutes newly discovered evidence entitling him to a new trial. We disagree.

To be entitled to a new trial on the basis of newly discovered evidence, a defendant must establish that (1) the evidence itself, not merely its materiality, is newly discovered; (2) the newly discovered evidence is not cumulative; (3) the defendant could not, with reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence would probably cause a different result on retrial. *Cress*, 468 Mich at 692. Newly discovered evidence may be grounds for granting a new trial even if it could only be used for impeachment, provided the defendant can satisfy the four-part test from *Cress*. *People v Grissom*, 492 Mich 296, 299-300; 821 NW2d 50 (2012). "[A] material, exculpatory connection must exist between the newly discovered evidence and significantly important evidence presented at trial." *Id*. at 300. The newly discovered evidence "may be of a general character and need not contradict specific testimony at trial," but it must make a different result probable on retrial. *Id*.

We first disagree that Dr. Diaz's proposed testimony about other potential causes of the cartilage tip fracture qualifies as newly discovered. In Paragraph 8 of his postconviction declaration, Dr. Diaz identified various potential causes of the cartilage tip fracture, including during defendant's efforts to remove Amy from the basement ceiling, during resuscitation efforts, during organ removal surgery while Amy was on life support, or during the autopsy. Dr. Diaz indicated in his opinion letter before trial that he had reviewed the police reports, the autopsy reports, scene and autopsy photographs, a rope study report, and Dr. Cassin's letter, all of which

-9-

would have included information identified in Dr. Diaz's postconviction declaration. There was no indication, or evidence, that Dr. Diaz was unaware before trial of any of the information on which he relied to conclude that there were other possible causes of the cartilage tip fracture. Therefore, the evidence was not newly discovered.

We also disagree that Dr. Diaz's postconviction discussion of other possible causes for the thyroid cartilage tip fracture would probably cause a different result on retrial. Defendant argues that the testimony was critical to rebut the prosecution's argument that the fracture supported its theory of a rear naked chokehold, but he overstates the significance of this proposed testimony. As already discussed, the evidence at trial clearly indicated that the actual cause of Amy's thyroid cartilage tip fracture was unknown, and there was evidence that such fractures can commonly occur during suspension hangings. Dr. Diaz did not profess to have new evidence regarding the actual cause of Amy's fracture, and he never denied that such a fracture could also occur during a rear naked chokehold. Dr. Diaz's opinion that there were other possible causes for the fracture did not contradict any evidence presented at trial; it merely reinforced that the actual cause of Amy's fracture was not known, as was already made clear by the evidence at trial. Further, it did not eliminate the possibility that the fracture could have occurred in a rear-naked-chokehold strangulation. Under these circumstances, even if Dr. Diaz's opinion could be considered newly discovered, it would not probably cause a different result on retrial. Therefore, the trial court did not err by denying a new trial on this ground.

Defendant also asserts that he should have been permitted to have Dr. Diaz testify at the evidentiary hearing. Defendant, however, has not demonstrated that he requested that Dr. Diaz be permitted to testify and was not allowed to present his testimony. Although the trial court indicated in its August 26, 2022 order that an evidentiary hearing was necessary to expand the record to take testimony from trial counsel regarding "his decisions at issue," there is no indication that the court foreclosed defendant from calling additional witnesses. Indeed, defendant called another witness at the *Ginther* hearing, and, after that witness was excused, the trial court asked defense counsel if she had "any other witnesses," and counsel responded, "I don't."

In his brief on appeal, the only reason offered by defendant for the necessity of Dr. Diaz's live testimony was to refute defense counsel's understanding of Dr. Diaz's condition. Defendant asserts that Dr. Diaz was not "unconscious" but only sedated to keep him comfortable, and he did not need surgery. This argument ignores that defense counsel was relying on his communications with Dr. Diaz's wife regarding Dr. Diaz's condition. Because the relevant inquiry is the information available to defense counsel at the time he made his strategy decisions, and there is no suggestion that defense counsel misrepresented what he was told by Dr. Diaz's wife or that either Dr. Diaz or his wife communicated to counsel that Dr. Diaz might be able to testify the following week, defendant has not demonstrated that Dr. Diaz's testimony was necessary for this purpose.

## C. POLYGRAPH RESULTS

In a reply brief in support of his motion for a new trial, defendant submitted the results of a private polygraph examination administered in July 2022. The examiner concluded that defendant was being truthful when he denied doing anything to cause Amy's death or putting the

cord around her neck. Defendant argues that the trial court erred by failing to consider the polygraph results when deciding his motion for a new trial. We again disagree.

As recognized in *People v Barbara*, 400 Mich 352, 412; 255 NW2d 171 (1977), a "judge in a post-conviction hearing on a motion for new trial based on newly found evidence may in his or her discretion consider the results of a polygraph examination." Polygraph results may be considered in deciding a motion for a new trial when:

> (1) they are offered on behalf of the defendant, (2) the test was taken voluntarily, (3) the professional qualifications and the quality of the polygraph equipment meet with the approval of the court, (4) either the prosecutor or the court is able to obtain an independent examination of the subject or of the test results by an operator of the court's choice, and (5) the results are considered only with regard to the general credibility of the subject. [*People v Mechura*, 205 Mich App 481, 484; 517 NW2d 797 (1994).]

Consideration of polygraph results are in the trial court's discretion. *People v McKinney*, 137 Mich App 110, 115; 357 NW2d 825 (1984).

First, defendant has not established that the foundational requirements for consideration of polygraph results were satisfied. Defendant submitted the polygraph results with a reply brief. There is no indication that the trial court was asked to approve the professional qualifications of the polygraph examiner or the quality of the polygraph equipment, or that defendant invited the prosecutor or the court to obtain an independent examination. Further, the results may only be considered to determine the credibility of the subject of the examination, and defendant's credibility or assertion of his innocence was not relevant to consideration of any of the grounds asserted in defendant's motion for a new trial. Accordingly, the trial court did not abuse its discretion by declining to consider defendant's polygraph results.

### III. EVIDENCE OF DEFENDANT'S OTHER ACTS OF DOMESTIC VIOLENCE

Finally, defendant argues that the trial court abused its discretion by allowing the prosecution to present evidence that defendant was previously involved in an altercation with his stepson in which he restrained the child with a chokehold. We disagree.[3]

We review the trial court's decision to allow this evidence for an abuse of discretion. *People v Washington,* 468 Mich 667, 670-671; 664 NW2d 203 (2003). An abuse of discretion

---

[3] Defendant also asserts that defense counsel was ineffective for not objecting to this evidence at trial, but the record discloses that counsel challenged the admissibility of this evidence in a pretrial motion in limine, which was sufficient to preserve the issue. The trial court issued a ruling before trial holding that the evidence was admissible, so there was no reason for counsel to object to this evidence again at trial. And because counsel challenged the admissibility of this evidence but was overruled by the trial court, defendant cannot succeed on an ineffective-assistance claim premised on a supposed failure to object to this evidence.

occurs when the trial court chooses an outcome that falls outside the range of reasonable and principled outcomes. *People v Galloway*, 335 Mich App 629, 637; 967 NW2d 908 (2020).

Defendant argues that the challenged testimony was not admissible for a relevant purpose under MRE 404(b)(1), but that argument is misplaced because the trial court admitted the evidence under MCL 768.27b, not MRE 404(b)(1). The court explained:

> [T]he proffered testimony is relevant because it makes the material fact of whether Defendant choked his wife, resulting in her death, more or less probable than it would have been without [the witness's] testimony. Additionally, as in [*People v Daniels*, 311 Mich App 257; 874 NW2d 732 (2015)], [the witness's] testimony is highly probative because it demonstrates Defendant's violent and aggressive tendencies, gives the jury a "full and complete picture" of his history, and tends to shed light on the likelihood that the alleged offense was committed. Defendant's contention that this is an improper purpose is simply unfounded in law, given the legislature's clear intention to permit such testimony through the passage of MCL 768.27b. For these reasons, [the witness's] proffered testimony regarding a prior act of domestic violence wherein Defendant allegedly choked him is admissible under MCL 768.27b. Having found that the testimony is admissible under that statute, the Court need not consider the parties' arguments regarding MRE 404(b).

Defendant further argues that even if the evidence was admissible under MCL 768.27b, it should have been excluded under MRE 403 because it was only marginally probative, and a jury was likely to give it undue or preemptive weight. At the time of the offense in 2018, MCL 768.27b(1)[4] provided:

> Except as provided in subsection (4), in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other acts of domestic violence is admissible for any purpose for which it is relevant, if it is not otherwise excluded under Michigan rule of evidence 403.

In contrast to MRE 404(b)(1), evidence can be offered under MCL 768.27b to show a defendant's propensity to commit other acts of domestic violence. *People v Rosa*, 322 Mich App 726, 734-735; 913 NW2d 392 (2018). Defendant does not dispute that the challenged testimony described an act of domestic violence that was within the scope of MCL 768.27b(1); he argues instead that the evidence was not offered for a relevant purpose and was unduly prejudicial under MRE 403.

MRE 402 provides that evidence which is not relevant is not admissible. Under MRE 401, " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The evidence that defendant placed his stepson in a chokehold during a domestic dispute was relevant in this case because it was the prosecution's theory that defendant

---

[4] MCL 768.27b was amended by 2018 PA 372, effective March 17, 2019, to add other acts of sexual assault in addition to acts of domestic violence.

killed Amy by placing her in a chokehold during a domestic dispute. The prior incident was probative of how defendant responded to domestic conflict in the family home and to show his knowledge of and propensity to use a chokehold maneuver against family members, which was central to the prosecution's theory of how Amy was killed. The evidence was thus relevant under MRE 401.

Under MRE 403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *People v Sabin (After Remand)*, 463 Mich 43, 57-58; 614 NW2d 888 (2000). To determine if evidence should be excluded under MRE 403, a trial court should perform a balancing test and consider the following nonexhaustive list of factors:

> [T]he time required to present the evidence and the possibility of delay, whether the evidence is needlessly cumulative, how directly the evidence tends to prove the fact for which it is offered, how essential the fact sought to be proved is to the case, the potential for confusing or misleading the jury, and whether the fact can be proved in another manner without as many harmful collateral effects. [*People v Daniels*, 311 Mich App at 273 (citation omitted).]

Unfair prejudice may exist where there is a danger that the evidence will be given undue or preemptive weight by the jury or where it would be inequitable to allow use of the evidence. *People v Mills*, 450 Mich 61, 75-76; 537 NW2d 909 (1995), mod 450 Mich 1212 (1995).

Defendant argues that the testimony should have been excluded because his daughter denied that the incident occurred as the stepson described. The daughter did not dispute that the incident occurred but claimed that defendant was only trying to calm his stepson down. She also denied that defendant grabbed his stepson around the throat, and said that defendant only used "a wrestling hold, like a quarter nelson" or something similar, until his stepson calmed down. This argument does not demonstrate that the proffered testimony was unfairly prejudicial. As already explained, the stepson's version of the incident, if believed, qualifies as an act of domestic violence under MCL 768.27b and was admissible for a relevant purpose under MRE 401. To the extent that the daughter viewed the incident differently, that did not render the evidence unfairly prejudicial. Indeed, the daughter's testimony provided defendant with the opportunity to diminish any prejudicial effect of the stepson's testimony.

Defendant further argues that the stepson's testimony was unfairly prejudicial because the prosecution's theory that Amy's thyroid cartilage tip fracture was caused by a chokehold "has now been refuted by the Diaz evidence." First, this argument is based on Dr. Diaz's posttrial opinion, which was not available or offered when the trial court ruled on the admissibility of the stepson's testimony. More significantly, contrary to what defendant argues, Dr. Diaz never offered an opinion that Amy's thyroid cartilage tip fracture could not have occurred from a rear naked chokehold. He offered other possible explanations for the fracture, but he never opined that a chokehold could not have caused the fracture. The fact that the stepson described defendant as placing him in a chokehold, which aligned with the prosecution's theory of how defendant killed Amy, enhanced the probative value of the evidence.

In sum, the record discloses that the trial court properly balanced the probative value of the evidence against its prejudicial effect, and it did not abuse its discretion by finding that the

evidence's probative value was not substantially outweighed by the danger of unfair prejudice. Accordingly, the court did not abuse its discretion by admitting the evidence.

Defendant also briefly states that evidence of text messages exchanged between his stepson and Amy about defendant not wanting the stepson to visit Amy in Michigan should have been excluded because they were irrelevant and unfairly prejudicial, especially when considered along with the evidence of defendant's physical assault of the stepson. We reject this additional claim of error.

Detective Rothman testified at trial that he recovered some text messages from Amy's cell phone. Among the messages was an exchange in November 2017, when the stepson reached out to Amy, his mother, and expressed his thankfulness to Amy and defendant for raising him. He wanted to visit them, and Amy responded that she wanted to see him too, but she did not want any tension. The stepson expressed his desire to repair their relationship and asked Amy to talk to defendant and see what he thought. A few days later, Amy told her son that defendant did not like the idea of him visiting, but Amy planned to see her son when she went to Florida.

There was no objection to testimony about the text messages that indicated that defendant did not want his stepson visiting Amy in Michigan. Although defendant now cursorily suggests that defense counsel was ineffective for not objecting to this evidence, the text messages were relevant because they were probative of the nature of defendant's relationship with Amy—they showed that Amy wanted to see her son, but defendant was opposed to having him visit in Michigan. Thus, any relevancy objection would have been futile. The failure to raise a futile objection does not amount to ineffective assistance of counsel. *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010). Defendant also fails to explain how this evidence impacted the admissibility of the evidence of defendant's assault of his stepson, and he does not otherwise explain why counsel should have objected to this evidence. Accordingly, defendant has not met his burden of proving that counsel was ineffective for failing to object to this evidence.

Affirmed.

/s/ Michael J. Riordan
/s/ Colleen A. O'Brien
/s/ Allie Greenleaf Maldonado

-14-